Case number 15-3104, Stephanie Yates v. Ortho-McNeil-Janssen, Pharmaceuticals, et al. Argument not to exceed 15 minutes per side. Mr. Woodard, you may proceed for the appellant. May it please the Court, Paul A. Woodard on behalf of the plaintiff and appellant, Stephanie Yates. I would reserve three minutes for her bottle. In 2001, the FDA approved the contraceptive patch Ortho-Evra. In 2002, a safer version of the patch called Evra was approved for marketing in Europe, but the defendants continued to market the less safe version, Ortho-Evra, here in the U.S. I'm sorry for interrupting you so early, but I thought a lot of these claims were based on the fact that the drug with a lower dosage was actually available and being sold before FDA approved it, not after. Your Honor, there was an ability to develop Evra before FDA approval. In fact, it was approved, Evra, the lower dosage drug, was approved just a few months, less than a year, after Ortho-Evra was approved. And the defendants certainly had the knowledge and the ability to develop it before Ortho-Evra's approval, so you're correct. But it actually didn't come along until after. It was not actually approved for marketing until a few months afterwards, in 2002. That's correct. And it wasn't sold in Europe until after the FDA approved it. That's correct. Okay, thank you. And in 2005, the plaintiff began using Ortho-Evra and, as a result, suffered a stroke. Defendants can and should be held liable because they should have been selling the lower dose Evra in the United States, and they should disclose that Ortho-Evra carried a greater risk of stroke compared to oral contraceptives, a warning that the FDA itself now requires defendants to include in Ortho-Evra's label. Now, I'll address first the plaintiff's design defect claim and then the failure to warn claim. The district court granted summary judgment dismissing the design defect claim on the basis of impossibility prediction. Now, according to the Supreme Court, impossibility is a demanding defense, and that's for a very good reason. In any preemption analysis, the ultimate touchstone is the intent of Congress. And in this field, the field of drug safety, the Supreme Court has already concluded that Congress did not intend to preempt state law claims. So to affect Congress's intent, the doctrine of impossibility preemption must be narrowly construed, must be applied only when there's absolutely no way to simultaneously comply with federal and state regulations. And here, that's simply not the case. Now, the state law duty at issue here is the duty to make Ortho-Evra's design safer. And there are two ways that defendants could have done that. They could have improved Ortho-Evra's design before the FDA approved Ortho-Evra, or they could have improved the design after FDA approval. And as this court recognized in Whitbush, that's an important distinction. You have to examine these two separate theories, the pre-approval and post-FDA approval theories separately, because the applicable federal standards depend on Ortho-Evra's approval status before the FDA. I want to ask you some questions, if I could, about this pre-approval claim that you're making. Essentially, you're saying that state law imposed a duty on a drug company prior to seeking FDA approval, right? That's correct. State law. Now, at that point, they've designed or they're in the process of designing a drug that they can't sell because it hasn't been approved yet. That's correct. So I'm having a little trouble articulating this, but I'm having trouble figuring out where the state law duty arises in connection with you doing something in the back room in connection with a drug that you're not selling. Where do I find that duty? The duty continues from the point where development of the design begins up to the point where the defendants sell the specific patch that injured Ms. Yates here. But you're just conflating the two when you say that. You're the one that, in your brief and in your argument, just now said pre-approval and post-approval, and there are two different ways to look at it. So I'm just not in pre-approval. What case can you point to in New York or any other place that says somebody has a duty to a consumer at a time when they are not putting whatever the product is out into the market? That's where my problem arises. Well, I can't point to a specific New York case which addresses that issue, and the reason why is because this is an issue which has just arisen. New York really hasn't had the opportunity to consider the issue. But I will note that just a few weeks ago— So, one, there's no New York case that says there actually is this pre-approval duty to start with when you're not selling. There's no New York State case which distinguishes between pre-approval and post-approval duties. Well, all the cases talk about post-approval. Correct. You have problems with the preemption there, so you might want to move back to pre-approval. We get that. Even if you can find or construe that duty, where's the causation that occurred pre-approval? I get the causation that occurs when you sell the drug, but that occurred after the FDA approval. So where's the causation for anything they did or failed to do pre-approval? The causation really is the same for the post-approval client. At any point in time, either before or after approval, the defendants could have made their drug safer. If they had made the drug safer, Ms. Gates wouldn't have been injured. So you can always avoid the—whatever preemption does exist can always be avoided by simply saying, well, we're focusing on the fact they could have done it better before they actually sought the FDA approval. No. If the preemption would cease to exist, would it not? No, I would not agree with that. In the case of a generic drug, for instance, you couldn't make this argument. Because generic drugs, regardless of if you're looking at pre-approval status or post-approval status, generic drugs are always subject to the duty of sameness. So once the counterpart brand name drug has been created, the generic drug's design has been fixed. So you can't make this argument in the context of a generic drug. But in your case, when you say make it safer, you're actually meaning reduce the dosage. That's correct. So you're saying that they could at any point have reduced the dosage without requiring additional approval from the FDA? That's right. Either pre-approval or post-approval. That's the post-approval situation. That's post-approval. But it's also pre-approval. And in fact, both this court— So you simply cannot rely upon FDA approval and whatever benefits accrue to that from a drug manufacturer's standpoint. Because you could always be accused of having been able to do it better or differently before you sought approval. The Supreme Court has made it clear that FDA approval does not create a safe harbor for drug companies. And again, to get back to the underlying policy here, we have to give it a purpose. We have to effect conscious purpose. And that's not to displace state law claims wherever possible. And in fact, both this court in Wembush and recently the Southern District of New York have embraced precisely this sort of analysis. This distinction between pre-approval and post-approval claims. In the context of pre-approval, because no FDA regulations, no federal law, prohibited the defendants from making the design of orthohebra safer before FDA approval, there's no possibility of preemption. That's exactly what this court held in Wembush. What a part of the preemption issue. I've been thinking while we went through this. And how did – I can't – I find it difficult to even see how causation works for an individual claim with a drug that has not been developed. I mean you have to assume the drug had been developed and that was the one that would have been prescribed by Ms. Yates' health care provider. And that's several steps away from our normal tort concepts of causation, isn't it? I disagree. And in part because we – this isn't some abstract drug. It's a drug that actually is being used in Canada, in Europe. So it's a very tangible drug. And in fact – Well, you have to assume that it had been developed and that it was being used pre-FDA approval and that this was the particular thing that would have been prescribed for your client. I mean I don't – that's pretty a teaming way. I disagree. I disagree, Your Honor, because again, this isn't some abstract notion of some drug that could possibly exist. It does exist. And defendants were trying to build – to produce this drug into the United States, and they weren't able to. That's how we ended up with orthoeperun in the first place. What does the record just out of curiosity show, if anything, about why the – if you're right that they were developing this drug in two different types at about the same time, based on when one was approved and then when the other one started to sell, why does one exist in a lower dosage outside the United States and a higher dosage in the United States? Does the record show that? It does, and Dr. Prussian's affidavit discusses this issue. The reason is defendants were attempting to create a low-dose drug, what today we see as Evra, from the get-go. The reason it didn't work is they had issues with the scaling-up process of manufacturing. So they switched manufacturers at the last second and used a different manufacturer who ultimately began to manufacture orthoeperun. The initial manufacturer is the one who ultimately came up with the Evra design, the safer design that the defendants should have used. Unless there are other questions regarding the design of the defect claim, I'll briefly touch on the failure-to-warn claim as well. The crux of the claim's claim is that in 2005, when the plaintiffs used orthoeperun, the defendants failed to disclose that orthoeperun carried a greater risk of stroke compared to whole contraceptives. Now, in dismissing that claim, the district court started and ended its analysis with a determination that the label disclosed that there was some risk of stroke and that the prescriber understood that there was some risk of stroke. But that's precisely the type of analysis that this court rejected in Hollister as oversimplified. And the reason why is both this court and New York courts consistently hold that for a warning to be adequate, it must not only disclose the existence of a risk, but sometimes it must also adequately convey the degree or level of a risk. But Mr. Woodard in Hollister, I thought the holding of that case was that it addressed the necessity of a warning in the first instance rather than the advocacy of a warning. You're correct that it did address the necessity of a warning in the first instance, but the analysis is exactly the same. And in fact, to look at this specific case, the FDA has embraced that precise analysis here. The FDA said that the previous – In Hollister, of course, there was no warning. There was no warning. That's correct. So how do you derive from Hollister that when there is a warning, it's got to be a comparative analysis of, in that case, for example, different shirts? Because the court was – That's not what the court said. The New York Court of Appeals has said that a warning must be qualitatively sufficient. It sometimes needs to go into the degree of risk, and that's the Martin case. And in fact, New York courts, such as the DiBartolo court, have applied this principle that we're discussing in the context of describing the increased risk of a side effect – describing an increased risk of a side effect under certain circumstances. And again, the open proof that the failure to warn claim or that the warning is not adequate as a matter of law is the FDA's opinion in this very case. Would it be fair to say that you actually want to take DiBartolo and you want to extend it one step further? Because as I read DiBartolo, what they're talking about there is you had to include a warning that says there's a higher risk to a patient if the patient has certain conditions. So it's not a comparative saying you've got all these different modalities, and you're comparing one modality to the other. You're talking about the condition of the patient. Well, that makes sense. So you want to take that and then say in addition to that, you also have to tell the patient they've got X numbers of choices, and here's how this choice ranks among those choices, or risk, right? That's correct. I'm not saying that you're right or wrong. I'm just asking, has any case taken that next step that you found? No, I can't point to any case, but I can point again. Anywhere, right? Anywhere. But I can point to the FDA's opinion in this very case. In New York, in all of the rarest cases, the adequacy of a warning is a question that goes to the jury. So certainly here, when the FDA itself has said that the warning was not adequate, that's a question that has to go to the jury. And I'll reserve my remaining time for rebuttal. Thank you, Your Honor. May it please the Court, my name is Irene Deese Walker, and I represent the defendant in this case. Your Honor, just a little context I think will help here. This is the last 2,000 cases pending before Judge Katz since 2006 in the Ortho Evra multidistrict litigation. And during that period of time, when all of these cases were disposed of by dismissal, dispositive motion, or settlement, there has been an evolution, both of the facts in this case, from the broad-brush 2008 opinions of Dr. Griesion, and the 2012 FDA rejection of the citizen's petition based on those opinions. And very complex scientific facts that I can only recommend the Court review that petition in Document 95-4 to understand some of the science. And in terms of, of course, preemption law evolving through Levine, Mensing, and Bartlett over that time period. Factually, some of these issues are critical because, for example, Ortho Evra, which is approved only outside of the United States, does not have a different dose of estrogen, it has a different amount of estrogen. And because in Europe they use a different incipient to deliver estrogen through the skin, and the different pharmacokinetic properties resulting from a different incipient make it bioequivalent in the dosage or deliverance. And that's just... I will clearly display my ignorance, but how is dosage and amount different? Because, Your Honor, the amount, for example, Evra is 6.6 micrograms amount of estrogen, as opposed to 7.2 micrograms of estrogen in the Ortho Evra. And it is the way the incipient, which is what drives that amount through the skin, and the absorption... Is the incipient the beginning, the delivery mechanism? Yes, Your Honor, it's like the membrane. What kind of membrane are you using for absorption? And if you have more absorption of a smaller amount, you end up with the same dosage. The dosage ends up being the concentration in the blood of certain estrogens. So the delivery mechanism is different in Europe and the United States? Right. It's still a patch. It still uses a membrane. But a constituent of that membrane that actually drives it through is what causes the difference. And that is why, of course, the relevance here is Evra is irrelevant because Evra was never approved in the United States for use. But it just demonstrates, quite frankly, these are the kinds of issues Judge Katz dealt with for over a decade, or close to a decade in these cases, and really drives many of the decisions, not just this decision, but the numerous other dispositive motions based on the particular state law of learned intermediary doctrine and how the preemption doctrine works. Now, as an example as well, if we look at the adequacy of the warning for P.A. Smith, the prescriber in this case, and Plankton comes up and asks a series of questions to her, well, did you realize that OrthoEvra actually delivered a greater dose or had the equivalent of a 50-microgram patch or pill? And she said, no. Well, when you read the entirety of those questions and answer them, pages 66 and 67, it's because she understood that the additional information and updates of the labeling that occurred over the years does not have to do with equating dosage to the concentration of estrogen in the blood due to pharmacokinetic differences. And that's what the citizens petition, the FDA rejected in the citizens petition. There is no correlation. And she says, well, I understood that the concentration in the blood may be different, but I understood that that also is a determinative of whether there's an increased risk of stroke and blood clots. And that's why Judge Katz focuses on warnings on stroke and blood clots, because the adequacy of the warning under New York law has to be based on the individual facts and through the prism of what the individual prescriber knew and understood. I want to get back, Judge Mattei, to what you mentioned about preemption. I think the concept that you're talking about is essentially negligence in the air. If we have this assumption that you're going to say, well, you were negligent in all of that. Did you make up that phrase? Not negligence in the air. It's been around for a long time. It's catchy, I just said. But to me, the key is if you look at the test that combined the Levine, Minson, Bartlett cases, the first element of that test is identify the actions that plaintiff's allegations require. So it's not just some actions. It may be, well, I went into a laboratory and I designed a design that might have been good or might not have been good, but who cares because it never went on the market. Plaintiffs allege to get liability under New York law, you have to market a drug that's unsafe. As the court says, they don't say New York law doesn't require, it requires a safe drug, not the possibility of a safe drug had you done something different before approval. And this is where the cases that talk about prior approval, potential steps leading up to FDA approval, would actually not be preempted because you have to identify what plaintiff's allegations, how plaintiff is going to establish liability in this case. We have recognized in one of our cases the distinction between pre and post. So drilling back to our case, in the pre-approval context, was that somehow factually different than what happened here? It was legally different in that it was before, I believe it was before Minson and Bartlett. Yeah. And it, when Bush said, just said, all right, we're going to correlate, number one, we're applying the physical impossibility test, which is not what Windows and Bartlett have. And we're just going to correlate what you did, all of the things you have to do up to FDA approval, and all the things the FDA requires, and see if the two can, if you can both comply with negligent design, negligent this, that, and the other, and you can comply with what FDA requires you to do. And there's no impossibility there. Well, that's the very thing that the dissent in Mensing said we should do. We should carve this out and look at each little act and decide if that act is impossible, physically impossible under the federal regulations. But that's not what the majority said. The majority said we're going to identify the acts that plaintiff's allegations require. And they rejected the idea that anything less than taking, less than marketing, anything just taking steps to get to market is sufficient because that's all speculative on what FDA might have done with a different design, with a different warning, with a different, whether you're talking about before or after, you have to look at what the allegations make the manufacturer liable for. Similarly, they rejected the stop-selling rationale because they said we should not have a test under preemption that requires the actor to cease acting in order to avoid liability. So you're suggesting that our case probably doesn't apply, based on more recent Supreme Court clarification of preemption cases. Absolutely, Your Honor. That, when Bush was decided at a time when Levine, Levine had just been decided, Levine was basically an obstacle preemption case saying, all right, FDA, it's quasi field preemption. Once FDA says it's approved and, oh, it's over, there can be no claims whatsoever. And it wasn't until you got Mensing and Farley that the court clarified, here's three-pronged tests. So let's apply it in this case. Number one, what is the plaintiff's allegation? What acts are required? Well, the plaintiff's allegation is that it's a product liability, which means something was injected into the stream of commerce that was unsafe because of design, warning, whatever. All right. What is the step two? Determine if there is a federal regulation that prevents the actor from complying with that state law without the assistance or special permission of a federal agency. In other words, can the manufacturer do this unilaterally, this state-required action that's a subject of allegation, unilaterally, independently, without the special assistance or aid of FDA? Well, what law? 21 U.S.C. 355A says no person shall put into interstate commerce any drug without any effective approval of FDA. That obviously requires a special permission and assistance of FDA. You cannot put a drug into commerce as required. It's an essential element of a product liability claim under state law without the special permission of FDA. So that alone, and then step three is if there's a conflict, if they can't do it independently and unilaterally without FDA assistance, it's preempted. So on the one hand, you could say, well, they could have done it because the FDA didn't say that they couldn't. But your response is back where we were with negligence in the air. They couldn't sell that hypothetical drug. So without the government's permission, so preemption applies. Right. It's a false construct to assume that preemption law in deciding whether there's a conflict in state law only looks to discrete acts independent of the liability that's being asserted because state law imposed liability is what we're really talking about here. And that's where the conflict comes in, in conflict preemption. And that's what the Supremacy Clause says cannot exist. That is basically it. There's not been a lot addressed of the – well, let's talk a little bit about adequacy of the warnings here and the finding that adequate is a matter of law. There are a lot of cases out there and a lot of cases cited in this court. But I think if you look at Martin v. Hacker, which is the only highest court of New York case that's been cited by either side, and really its most recent interpretation in McDowell v. Eli Lilly, which is interestingly enough a case where it was about withdrawal of Cymbalta. And the allegation was, well, you know, you knew that actually 44 to 50 percent of people get withdrawal symptoms, but you said you were labeling only 1 percent. So this is a degree, this is an intensity thing. And the court projected it, saying you have to look at the labeling as a whole. You have to look at what this particular prescriber knew and understood to see if that prescriber was sufficiently warned to exercise independent judgment in prescribing this. And you had that all over the record in this case. You have a woman who came in and told her prescriber, don't give me the oral contraceptive because I don't remember to take pills. I can't remember to take pills. That's the number one issue, compliance with unintended pregnancies. Over 1 million women a year on OCs, oral contraceptives, get pregnant because they forget to take the pill. And pregnancy is a greater cause of death by stroke than hormonal contraceptives. Number two, she says, I don't want to do the ring because I don't like the idea of sticking up something in my body and I'm leaving it there. So can't do that. Number three, she tries the injection, and she comes back and says, too much wiping, I can't do that. What do you have left? Well, the prescriber tells you at page 95 of her deposition. If I'm given that information, the option I have left is a patch to prevent unintended pregnancies from these women. And what did you understand? I understood about the risk of strokes and clotting. I weighed those. I always weigh that independent information in my clinical experience when I make this independent judgment. And pages 66 and 67 of her deposition is where she explains, all this stuff you're telling me about being two times risk, all this, that's not how I interpret concentration of estrogen in the blood and the pharma, the PK mechanics of it. That's why Judge Katz understood in this case, based on many years, that this woman, this prescriber prescribed what was in the best interest for her patient at that time, fully aware and warning the patient of the risk of clots and stroke. The exact side effect materialized in this case. For all of these reasons, we ask that this Court please affirm. Thank you. Mr. Warren. Wimbush is still good law. And, in fact, the Sullivan District of New York adopted the exact same rationale just a few weeks ago in Sullivan v. Aventis, a case that was cited in the defendant's supplemental submission just in the past few weeks. Now, Judge McKeague, you referenced that there are two ways to look at impossibility, the impossibility test in this context. But the underlying principle here is that impossibility must be narrowly construed to give effect to Congress's intent. So if there are two ways to look at impossibility, we have to look at the more narrow interpretation of it. And I refer to this Court's language in the Fulgenzi case, which was after mincing. This Court said that the test for impossibility under mincing is whether the private party could independently comply with its state duty without relying on the prior exercise of federal agency discretion. So how could they produce a product and sell it in a different configuration pre-approval? They could design the drug pre-approval. They could do lots of different things. But how can they comport with what you say is a state law duty for which you don't have any cases if they can't sell that product? The state law duty there is not just the duty to market the drug safely. It's to design it safely in the instance, in the first instance. And the New York Court of Appeals, the highest court, in Denny, France… But the violation of that duty is going to occur when they sell the drug. That's correct. But one way to comply with that duty is to make it safer in the first instance, but before the FDA regulations kick in. And again, as you said, there are two different ways to look at this issue. And you have to look at the more narrow version of it. Ms. Kieswalker tells us correctly or incorrectly that one of the components of the doctrine is you have to have been able to do it without any government approval. I'm paraphrasing. Now, they can't produce and make a drug with this lower dosage amount of membrane, whatever it is, without FDA approval, right? That's correct. But that's not what we're asking them to do here. We're just simply asking them to make the drug safer. That's all that – to make the drug safer. We're not asking them to market it. We're just asking them to make the drug safer. That's all that the state law design defect claim is looking to accomplish here. Where do you get standing to ask them to make a drug safer that is not put into the stream of commerce and taken by your client? Well, it does ultimately depend on it being put in the stream of commerce. But one way to comply with that duty – But the allegedly safer one was never put into the stream of commerce, at least in this country. That's correct, but this really gets back to – may I wrap up, Your Honor? You may take a sentence or two to finish your answer to Judge McGee's question. Well, I've got to dominate it. You're standing back up. The other – the panel may have a few others. Do you have any answer to your question? I forgot part of it. I don't have any questions. No more questions. For these reasons, let me ask the court first. For these reasons, the argument both of you have given. And we'll consider the case carefully. We're recommending this case.